**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

In re:

JOSEPH G. GORSKI,              *

                                        *         Case No. 19-11500-DER

          Debtor.           *         Chapter 11

                                          *

<u>**DEBTOR'S AMENDED DISCLOSURE STATEMENT**</u>

**I.**     <u>**GENERAL INFORMATION**</u>

     **A.**    **Introduction**

     Joseph G. Gorski, Debtor and Debtor-in-possession (the "Debtor") in the above captioned bankruptcy case, submits this Amended Disclosure Statement (the "Disclosure Statement") in order to disclose the information believed to be material for creditors to arrive at a reasonably informed decision in exercising their right to vote on the Debtor's Amended Plan of Reorganization (the "Plan"), filed concurrently herewith in the United States Bankruptcy Court for the District of Maryland (Baltimore Division) (the "Bankruptcy Court" or "Court"). The Debtor is the proponent of the Plan.

     Pursuant to §1125 of the United States Bankruptcy Code (the "Bankruptcy Code" or "Code"), this Disclosure Statement must be approved by the Bankruptcy Court, and must contain adequate information to permit affected creditors and interest holders to make an informed judgment in exercising their right to vote to accept or reject the Plan. The approval of this Disclosure Statement by order of the United States Bankruptcy Court for the District of Maryland is not a decision by the Court on the merits of the Plan.

     The Debtor has filed this Disclosure Statement in connection with the solicitation of acceptances and approval of his Plan. A copy of the Plan is attached hereto as **Exhibit A**. Unless the context otherwise requires, the capitalized terms used herein shall have the meanings

1

specified in the "Definitions" section of the Plan and, if no definition is provided in the Plan, then the definition of the term provided in the Bankruptcy Code shall be used.

The purpose of this Disclosure Statement is to provide Debtor's creditors and parties in interest with adequate information of any kind, and in sufficient detail, as is reasonably practicable in light of the nature and history of the Debtor, upon which the creditors may base an informed decision regarding whether to accept or reject the Plan.

Except as otherwise set forth in this Disclosure Statement and the Plan, the Debtor proposes to pay Allowed Claims during the term of the Plan, which shall be no later than five (5) years from the Effective Date.  The Debtor believes the acceptance of the Plan is in the best interests of the Debtor and his creditors and offers creditors the best opportunity for a meaningful distribution.  The Debtor urges all of the Debtor's creditors to vote in favor of the Plan.

Once the Disclosure Statement is approved by the Court, each creditor will be provided with a ballot on which the creditor indicates their acceptance or rejection of Debtor's Plan, based upon the Plan itself, and the information contained in this Disclosure Statement.  The ballot will accompany this Disclosure Statement when it is approved by the Court.

The Debtor has reviewed the information contained herein and has determined the information is accurate to the best of his knowledge.

### B.      Definitions

The terms and definitions set forth in Article I of the Plan are also applicable to, and are used in, this Disclosure Statement unless expressly stated otherwise in this Disclosure Statement.  You therefore are urged to refer to the Plan when reviewing this Disclosure Statement.

### C.      Disclaimers

NO REPRESENTATION CONCERNING THE DEBTOR, THE VALUE OF HIS

PROPERTY, OR THE PLAN, ARE AUTHORIZED BY THE DEBTOR UNLESS SET FORTH IN THIS DISCLOSURE STATEMENT.  ACCORDINGLY, NO REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING THE RIGHT TO VOTE OR NOT TO VOTE ON THE ACCEPTANCE OF THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  NO REPRESENTATION IS MADE THAT ANY FINANCIAL SYNOPSES ANNEXED HERETO OR RELIED UPON HEREIN ARE PREPARED IN ACCORDANCE WITH GAAP.  THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. MOREOVER, THIS DISCLOSURE STATEMENT SHOULD NOT BE DEEMED CONCLUSIVE ADVICE ON THE TAX AND OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AND INTERESTS.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERY TO HIS CREDITORS.  THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, THE BANKRUPTCY COURT HAS AUTHORIZED NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF THEIR ASSETS.  IN VOTING ON THE PLAN, YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN BY CREDITORS OF THE

3

DEBTOR, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, MAY PROVIDE SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED, AND DISSEMINATION OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPILED.

THE PLAN AND DISCLOSURE STATEMENT ARE COMPLEX INSOFAR AS THEY CONSTITUTE A LEGALLY BINDING COMMITMENT BETWEEN CREDITORS AND THE DEBTOR.  ACCORDINGLY, CREDITORS AND PARTIES-IN-INTEREST ARE URGED TO SEEK LEGAL COUNSEL IF UNSURE OF THE EFFECT OF THE PLAN AND DISCLOSURE STATEMENT.

The description of the Plan in this Disclosure Statement is a summary only, and creditors and other parties in interest are urged to review this entire Disclosure Statement and its Exhibits, the detailed description of the Plan contained herein, and the Plan itself which is annexed hereto, for a full understanding of the Plan's provisions.

**D.      Scheduled Hearing**

The Bankruptcy Court will schedule a hearing to consider confirmation of the Plan.  This hearing may be adjourned from time to time without further notice other than by announcement

in the Bankruptcy Court on the scheduled date of such hearing.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Code, including whether the Plan is feasible and whether it is in the best interest of the creditors.  The Bankruptcy Court will then receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties in interest and creditors entitled to vote.

        **E.**       **Recommendation of the Debtor**

The Debtor believes that the Plan provides the greatest and earliest possible recoveries to all creditors, that the acceptance of the Plan is in the best interest of all creditors and recommends that they vote to accept the Plan.

**II.**      **VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN**

        **A.**    **Manner of Voting on Plan**

**Voting Instructions**

The deadline for voting on the Plan will be provided by the Bankruptcy Court.  In order for your ballot to be counted, it is imperative that it be received by the stated deadline. Ballots will be provided once the voting deadlines are set.

In order to simplify the voting procedure, ballots will be sent to the scheduled holders of all claims, including claims which the Debtor may dispute.  However, the Bankruptcy Code provides that only holders of allowed claims and interests (or claims and interests which are deemed "allowed") are entitled to vote on the Plan.

To return your ballot, or if a ballot is damaged or lost, or if you have any questions concerning voting procedures, contact:

           Steven L. Goldberg, Esquire
           McNamee, Hosea, Jernigan, Kim,
           Greenan, & Lynch, P.A.
           6411 Ivy Lane, Suite 200

Greenbelt, Maryland  20770
Telephone: 301-441-2420
E-mail: Sgoldberg@mhlawyers.com

A separate envelope will be been provided for the return of your ballot.  BALLOTS MUST BE RECEIVED BY THE STATED DEADLINE.

Before voting, this Disclosure Statement as well as the Plan should be reviewed in their entirety.  You should use only the ballots sent to you with this Disclosure Statement and Plan to cast your vote for or against the Plan.

**B.      Claim Holders Entitled to Vote**

Subject to the exceptions provided below, any claim holder whose claim is impaired under the Plan is entitled to vote if either (1) its claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) such claim holder has filed a proof of claim with respect to a disputed claim that is not the subject of an objection to claim filed by the Debtor in the Bankruptcy Court.

A holder of a disputed claim that is the subject of an objection to claim filed by the Debtor prior to the deadline for voting on the Plan, is not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of the creditor whose claim has been objected to, temporarily allows the claim in an estimated amount which it deems proper for the purpose of voting to accept or reject the Plan.  Any such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court as the final date to vote on the Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the creditor is not solicited or procured in good faith or in accordance with the provisions of the Code.

**C.      Vote Required for Class Acceptance**

The Bankruptcy Court will find that the Plan has been accepted, if, for each impaired

6

class that has voted, there are votes submitted by at least two-thirds (2/3) of the total amount of the voted claims in the class and more than one-half (1/2) of the total number of voted claims in the class, in support of the Plan.

### D.   Cramdown

In order to confirm the Plan, among other things, the Debtor must establish that, in accordance with §1129(a)(8) of the Bankruptcy Code, each Class of Claims or Interests either (i) has accepted the Plan or (ii) is not Impaired under the Plan.  In the event that neither of these requirements can be satisfied, however, and all other applicable requirements for confirmation under §1129(a) of the Bankruptcy Code are satisfied, the Plan may be confirmed by the Court, provided that the Plan does not "discriminate unfairly," and is "fair and equitable" with respect to any Class of Claims or Interests that is impaired under and has not accepted the Plan. The phrase "fair and equitable" has different meanings for secured and unsecured class and classes for interest.

If one or more classes of impaired claims under the Plan rejects the Plan, the Debtor reserves the right to request the Bankruptcy Court to determine at the confirmation hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims so as to allow the confirmation despite the vote to reject the Plan.

The Debtor also reserves the right to amend the Plan at that time in such manner as to permit confirmation over the vote of the rejecting impaired class.

## III.   BACKGROUND

### A.   Events Leading to the Bankruptcy

Since approximately 1974, the Debtor has owned and operated an export trading business known as Vienna Establishments Limited, a/k/a Tradeways, Ltd. (hereinafter, "Tradeways"). Tradeways is a recognized leader in the international nuclear, biological and chemical defense

7

community.  Tradeways specializes in exporting chemical, biological, radiological and nuclear defense equipment to allied governments and other clients.   Since its formation, in addition to defense equipment, Tradeways has distributed products to customers in over 50 countries ranging from machine tools and gas masks to armored limousines and earth moving equipment. Tradeways' export operations extend as far as South America, Africa, Asia, Europe, Australia and the Middle East.

Due to the nature of the products it exports, the sales cycle can often take years from contract to payment, resulting in irregular revenues to Tradeways.  A single transaction that results in gross revenues to Tradeways of $1,000,000.00 is not unusual, but such a transaction could, and in many cases does, take several years for payment to be received.

Demonstrative of its significant revenue swings, Tradeways' historical revenues are illustrated in the table below:

| Tax Year | Gross Income | Expenses | Net Income |
|---|---|---|---|
| 2016 | $307,218.00 | $766,910.00 | ($459,692.00) |
| 2017 | $6,461,660.00 | $530,820.00 | $5,930,840.00 |
| 2018 | ($996,050.00) | $986,910.00 | ($1,982,960.00) |
| 2019[1] | $5,968,094.27 | $5,859,603.20 | $108,491.00 |

Tradeways irregular income has resulted in significant IRS trust fund liability, for which the Debtor has been personally assessed.  Tradeways' irregular income has also caused the Debtor to fall behind on his mortgage and some of his personal tax obligations.

The Debtor commenced this case in order to stay a scheduled foreclosure sale of his

---

[1] Tradeways' accountants are still reconciling the 2019 end of the year books and records in preparation of its 2019 tax returns.  Accordingly, the 2019 revenue and expense numbers are subject to change.

Principal Residence.

**B.      The Debtor's Principal Assets**

(i)      **The Principal Residence - 400 Ferry Point Road, Annapolis, Maryland**

The Debtor's principal asset consists of his Principal Residence located at 400 Ferry Point Road, Annapolis, Maryland.  The Debtor acquired the property in 1991 for approximately $1,250,000.00.  As a result of a payment default, the Bank of New York Mellon Trust Company, successor-in-interest to Bank of America, N.A., commenced a foreclosure action against the Ferry Point Road Property.   The Debtor's bankruptcy case was filed in order to stay the foreclosure sale.

Beginning in approximately February of 2018, the Debtor begin began marketing the Principal Residence for sale for $2,100,000.00, before reducing the purchase price to $1,600,000 in September of 2018.  On November 28, 2018, the Debtor received a third party offer to purchase the Principal Residence for $1,500,000.00, which the Debtor rejected. . The Debtor has not marketed the Ferry Point Road Property since the Petition Date, but intends and is in-fact required to to do so pursuant to the terms of his the Plan.

As of the Petition Date, the Bank of New York Mellon Trust Company asserted a lien against the property in the amount of $442,900.53.  Properly marketed and conditioned, the Debtor believes the fair market value of the property is approximately $1,800,000.00.  If the property were subdivided into two lots which, with certain permitting is believed to be achievable, the Debtor believes the Ferry Point Road Property could achieve a value of up to $2,000,000.00.[2]  Approval from the County to subdivide the property is estimated to cost

---

[2] For purposes of the financial projections supporting this Plan, the Debtor is estimating gross sale proceeds for the Ferry Point Property in the amount of $1,600,000.00.

9

approximately $25,000.00, and is estimated to take approximately 1 year.[3] Due to the condition of structures on the Property, and the time and potential expense in obtaining necessary approvals from the County, the Debtor does not anticipate he will be able to obtain the required approvals to subdivide the Ferry Point Road Property prior to the Final Date (as that term is defined in the Plan).

As of the Petition date, the Ferry Point Road Property was encumbered by the following liens:

| | |
|---|---|
| First Priority Lien: Bank of New York Mellon Trust Co.: | $442,900.53 |
| Second Priority Lien:  SunTrust Bank: | $35,810.79 |
| Third Priority Lien:  Daniel Kohn Living Trust: | $979,996.23 |
| Fourth Priority Lien:  Internal Revenue Service | $160,453.45 |
| **Total Liens**: | $1,619,160.90 |

Since the Petition Date, the Debtor has regularly made post-petition mortgage payments to the Bank of New York Mellon Trust Company.

(ii)      **The Rental Property - 803 Mayfair Blvd, Toledo, Ohio 43612**

By deed recorded on or about September 29, 2012, the Debtor inherited the real property and improvements located at 803 Mayfair Blvd., Toledo, Ohio 43612.  The Mayfair Blvd. property Property has a fair market value ofis estimated to be valued at approximately $70,000.00.  As of the Petition Date, Directions Credit Union asserted a lien secured by the Mayfair Blvd. property Property in the amount of approximately $3,469.01.  As of the date of this Disclosure Statement, the lien of Directions Credit Union is believed to be less than $1,250.00.  Since the Petition Date, the Debtor has regularly made its post-petition mortgage payments to Directions Credit Union.     The Mayfair Blvd.. property Property is currently rented through December 2020.  The Debtor receives approximately $8,400 in rental income.

---

[3] The Debtor intends to complete any effort to subdivide the Ferry Point Road Property prior to marketing it for sale (but no later than March 1, 2021).   To the extent available funds exist, the Debtor may fund the necessary costs to subdivide the property prior to a sale.  As of the date of this Disclosure Statement, the Debtor has not commenced efforts to subdivide the Ferry Point Property.

(iii)     **The Debtor's Equity Interests**

a.     *184 Duke of Gloucester, LLC*

The Debtor owns a 70% interest in 184 Duke of Gloucester, LLC.  The Debtor's adult children own the remaining 30% of the interests in the LLC.  Duke of Gloucester, LLC owns a commercial building located at 184 Duke of Gloucester, Annapolis, Maryland.  Other than its ownership of the property located at 184 Duke of Gloucester, 184 Duke of Gloucester, LLC's sole source of income is derived from rent it receives (or is otherwise due)  from Tradeways, Ltd.  Tradeways' payment of rent to 184 Duke of Gloucester, LLC is irregular.  The Debtor estimates the fair market value of the property owned by the LLC to be approximately $770,000.00.

184 Duke of Gloucester, LLC's historical revenues are illustrated below:

| Year | Gross Rents | Expenses | Net Income |
|------|-------------|----------|------------|
| 2016 | $60,000.00 | $18,901.00 | $41,099.00 |
| 2017 | $16,800.00 | $23,695.00 | ($6,895.00) |
| 2018 | $18,400.00 | $19,055.00 | ($655.00) |
| 2019 | $19,000.00 | $27,026.00 | ($8,026.00) |

The Estate of Daniel Kohn (Class 3 Claimant) asserts an Indemnity Deed of Trust against 184 Duke of Gloucester (the real property) in the amount of $979,996.23.[4]  The Estate of Daniel Kohn also asserts a third priority lien against the Debtor's principal residence located at 400 Ferry Point Road, Annapolis, Maryland 21403Ferry Point Road Property.  As set forth in Article VIII(E) of this Disclosure Statement, upon the sale of the Ferry Point Road Property, the Estate of Daniel Kohn will receive $600,000.00 in sale proceeds, reducing its lien against 184 Duke of Gloucester to no more than $379,996.23 (*i.e.* $979,996.23 - $600,000.00).

---

[4] No other liens are secured by or against 184 Duke of Gloucester.

After application of hypothetical closing costs, taxes, and the value of the lien held by the Estate of Daniel Kohn, the Debtor's 70% ~~equity interest in~~interest in the equity of the property owned by 184 Duke of Gloucester, LLC is estimated to be approximately $235,000.00.

    b.    *Tradeways, Ltd.*

As set forth in Article III(A) of this Disclosure Statement, the Debtor also owns 100% of Tradeways, Ltd.

Tradeways' liabilities exceed its assets.  According to Tradeways' balance sheet as of November, 2019, Tradeways had approximately $1,482,000.00 in assets, and $6,513,194.48 in liabilities.  As a result, if Tradeways were liquidated under the Plan, the Debtor's equity interest would yield no recovery for distribution to creditors.

As of the date of this Disclosure Statement, Tradeways has active orders and a pipeline of new opportunities totaling approximately $~~7,000,000.00~~6,529,070.00 in gross revenues, which will generate sufficient income that will in turn enable the Debtor to fund payments under the Plan.  A schedule of active and potential transactions is attached hereto as **Exhibit C.**

As set forth above, Tradeways has been in operations for more than 45 years.  Since its formation, due to the nature of its business, Tradeways has historically experienced wide swings in revenues.  Notwithstanding the irregularity of its income and the short-term pressure on cash flow resulting from the COVID-19 pandemic,[5] the Debtor is confident that Tradeways' experience and ~~p~~its current and projected pipeline will result in ample revenues to permit the Debtor to fund the Plan.

---

[5] Tradeways' business relies heavily on foreign travel and in-person meetings, which have halted due to the COVID-19 outbreak.  In April of 2019, Tradeways' sought relief under the CARES Act for a Paycheck Protection Program ("PPP") loan in the amount of $86,000.00, but was determined to be ineligible due to the Debtor's individual bankruptcy filing.  Notwithstanding Tradeways' ineligibility for a PPP loan, Tradeways' expects to be able to obtain alternative sources of funding to address any short-term cash flow pressure that may result from the continued impact from COVID-19.   Notwithstanding, because the majority of Tradeways' customers are allied governments, the Debtor anticipates the impact from COVID-19 to be temporary.

12

(iv)    **The Debtor's Personal Property**

The Debtor's remaining assets consist principally of a vehicle, home furnishings, cash and investments with an estimated aggregate value, net of exemptions, of approximately $2013,000.00.

C.    **The Debtor's Income**

The Debtor receives income from three sources, as summarized below:[6]

| | Social Security | Gross Wages (plus distributions and expense reimbursements) | Gross Rental Income |
|---|---|---|---|
| **Tax Year 2018** | $34,997.00 | $120,000.00 | $8,400.00 |
| **Tax Year 2019** | $36,427.10 | $221,672.72 | $8,500.00 |
| **YTD Thru 2/2020** | $6,619.00 | $37,616.50 | $1,371.00[7] |

A summary of the Debtor's aggregate post-petition income, as set forth more fully in the operating reports filed in this Bankruptcy Case, is summarized below:

| Month | Total Income |
|---|---|
| February, 2019 | $24,726.10 |
| March, 2019 | $18,258.94 |
| April, 2019 | $13,306.61 |
| May, 2019 | $29,455.94 |
| June, 2019 | $15,755.39 |
| July, 2019 | $11,026.10 |
| August, 2019 | $15,454.93 |
| September, 2019 | $47,026.10 |
| October, 2019 | $45,517.30 |
| November, 2019 | $19,427.39 |
| December, 2019 | $26,643.52 |

---

[6] The Debtor divorced in 1989.

[7] $685.50 was offset by the property management company to fund repairs to the property.

13

| | |
|---|---|
| **Total:** | **$266,598.32** |

**2020:**

| | |
|---|---|
| January, 2020 | $17,182.00 |
| February, 2020 | $27,053.00 |
| March, 2020 | $11,851.00 |
| April, 2020 | $11,451.00 |
| May, 2020 | $13,503.00 |
| | ~~$44,235.00~~$81,089.00 |

**Formatted:** No underline

**Formatted:** Font: Bold

The Debtor expects to continue to receive income from the foregoing sources, though the Debtor anticipates that during the term of the Plan, the Debtor's income from the operations of Tradeways will increase as the export transactions are finalized.

## IV.    DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

The Debtor has designated the following classes of Claims and Interests under the Plan. Pursuant to § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the classes listed below.  The designation of Administrative Expense Claims and Priority Tax Claims is set forth in Section V, below:

**Class 1**:  (Allowed Secured Claim of Bank of New York Mellon Trust Company) ($442,900.53).  Class 1 consists of the Allowed Secured Claim of the Bank of New York Mellon Trust Company in the approximate amount of $442,900.53.  This Class is Impaired.

**Class 2**:  (Allowed Secured Claim of SunTrust Bank) ($35,814.79).  Class 2 consists of the Allowed Secured Claim of the SunTrust Bank in the approximate amount of $35,814.79. This Class is Unimpaired.

**Class 3**:  (Allowed Secured Claim of the Estate of Daniel N. Kohn) ($979,996.23).

14

Class 3 consists of the Allowed Secured Claim of the Estate of Daniel N. Kohn in the approximate amount of $979,996.23.   This Class is Impaired.

**Class 4**:  (Allowed Secured Claim of the Internal Revenue Service) ($160,453.45).  Class 4 consists of the Allowed Secured Claim of the Internal Revenue Service in the approximate amount of $160,453.45.  This Class is Impaired.

**Class 5**:  (Allowed Unsecured Claim of the Department of Labor) ($146,517.38).  Class 5 consists of the Allowed Unsecured Claim of the Department of Labor in the approximate amount of $146,517.38.  This Class is Unimpaired.

**Class 6**: (Allowed General Unsecured Claims) ($~~530,735.37~~535,893.88):  Class 6 consists of Allowed General Unsecured Claims in the approximate amount of $~~530,735.37~~535,898.88.   This Class is Impaired.

## V.    DESIGNATION OF UNCLASSIFIED CLAIMS

The Debtor has designated the following Claims as unclassified, pursuant to §1123(a)(1) of the Bankruptcy Code.  The treatment of such unclassified claims is set forth in Sections VII, and IX, below.

(i)    Allowed Administrative Expenses:  Administrative Expenses, as allowed, consist of approved claims for professional fees unpaid as of the date of confirmation and all other administrative expense claims entitled to priority under §§507(a) and 503(b)(4) of the Bankruptcy Code.  All such administrative expense claims for professional fees are subject to review and approval by the Bankruptcy Court.  The Debtor estimates that the Allowed Administrative Expenses will be **$23,000.00**.

(ii)   Unsecured Priority Claims:  Unsecured Priority Claims, as allowed, consist of the claims of governmental units for prepetition tax liability.  The Comptroller of Maryland asserts a priority unsecured claim in the amount of **$54,051.00**.  The Internal Revenue Service asserts a priority unsecured claim in the amount of $~~658,311~~675,342.98~~.36~~.  To the extent such Priority Tax Claims

15

are Allowed, they shall be paid within sixty (60) months from the Petition Date as required by the Bankruptcy Code, with interest at the applicable legal rate.

The Plan contemplates that all allowed Administrative Expense Claims and Unsecured Priority Claims shall be accorded treatment and payment as provided for by the Bankruptcy Code and will be paid as described in Sections VI through VIII, herein.  All Administrative Expense Claims of professionals for services provided to the Debtor must be approved by Order of the Bankruptcy Court.

## VI.   CLAIMS

The Debtor approximates the following Claims, which include estimated post-petition interest, fees and costs.  If you filed a proof of claim that has not been objected to, or your Claim is scheduled as undisputed in the Debtor's Schedules, you have an Allowed Claim in that amount unless and until the Bankruptcy Court orders otherwise.  The Claim amounts set forth in this Disclosure Statement shall not constitute an objection to your Claim.  An objection to ~~claim~~claim, if one is commenced, must be filed with the Bankruptcy Court and served in conformity with the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.  All parties, including the Debtor, reserve their respective rights with respect to the validity or amount of any stated, filed or scheduled Claims.[8]

### A.   Classes of Claims

| | | |
|---|---|---|
| **CLASS 1:** | Allowed Secured Claim of Bank of New York Mellon Trust Company: | $442,900.53 |
| **CLASS 2:** | Allowed Secured Claim of SunTrust Bank: | $35,810.79 |
| **CLASS 3:** | Allowed Secured Claim of Estate of Daniel Kohn.: | $979,996.23 |
| **CLASS 4:** | Allowed Secured Claim of IRS: | $160,453.45 |

---

[8] The Amounts set forth herein are amounts asserted by the Claimants as of the Petition Date, and do not reflect the current balance due.

16

**CLASS 5:**     Allowed Unsecured Claim of the Dept. of Labor.:     $146,575.38

**CLASS 6:**     Allowed General Unsecured Claims:
$~~531,292.88~~535,893.88

B.     **Administrative Expense Claims**:  The Administrative Expense Claims, subject

to approval by the Bankruptcy Court, are as follows:

(1)  Legal expenses:

    (i) McNamee Hosea, <u>et al</u>.                     $23,000.00
       (Debtor's Counsel)                         [estimated]

(2)  Office of the United States Trustee:            $1,625.00
    (to be paid as fee is assessed without further       [estimated]
     order of Court)

C.     **Unsecured Priority Tax Claims:**

(i)     Internal Revenue Service:               $~~658,311.36~~675,342.98

(ii)    Comptroller of Treasury:                $54,051.00

## VII.    TREATMENT OF CLAIMS AND INTERESTS

A.     **General**

In general, a plan of reorganization under Chapter 11 may provide that the rights of

certain classes of claims or interests will remain unchanged under the Debtor's reorganization.

The Claimants and interest holders included in such classes remain unaffected by the Plan.

These parties are described as "unimpaired" under the Bankruptcy Code and are deemed to have

accepted the Plan.  <u>See</u> §1126(f) of the Bankruptcy Code.  As a result, it is unnecessary to solicit

votes from Claimants or interest holders in such unimpaired classes.

## VIII.   MANNER OF PAYMENT OF CLAIMS AND TREATMENT OF INTERESTS

17

**A.**    **Payment of Administrative Expense Priority Claims:**

The Debtor will pay the Administrative Expense Claims of professionals, as approved by the Bankruptcy Court, in full, on or before the Effective Date.  The Debtor projects that the Administrative Expense priority claims for professionals include only those of Debtor's counsel.  The Debtor anticipates Administrative Expense Claims of professionals to be approximately $23,000.00.

The Debtor will also continue to make his payments to the Office of the United States Trustee for quarterly fees as assessed, in a timely manner.  The Debtor's payments to the United States Trustee will be made in addition to the Plan payments to be provided to satisfy the Administrative Expense priority claims of professionals.

**B.**    **Payment of Unsecured Priority Claims:**

Unsecured Priority Claims, as allowed, consist of the claims of governmental units for prepetition tax liability pursuant to 507(a)(8).  The Comptroller of Maryland asserts and Unsecured Priority Tax Claim in the amount of $54,051.00.  The Internal Revenue Service asserts an Unsecured Priority Tax Claim in the amount of $~~658,311.36~~675,342.98.  To the extent such Allowed Priority Tax Claims are Allowed, such claims shall be paid within sixty (60) months from the Petition Date as required by the Bankruptcy Code with interest at the applicable rate.  As set forth in more detail in Article X and XVIII, the Debtor anticipates that upon the sale of the ~~Principal Residence and the Toledo, Ohio property~~Ferry Point Road Property and the Mayfair Blvd. Property, Allowed Priority Tax Claims will be curtailed by ~~between $334,000 and $520,000 (depending largely on the sale price of the Principal Residence)~~approximately $495,000.00, as described more fully in **Exhibit B** to this Disclosure Statement.  The balance of Unsecured Priority Tax Claims will be paid from the Debtor's income.

**C.**    **Payment of Secured Claim of Bank of New York Mellon Trust Company.**

**Formatted:** No underline

**Class 1**

This Class consists of the Allowed Secured Claim of Bank of New York Mellon Trust Company pursuant to a Note dated November 15, 1991, and secured by a Refinance Deed of Trust recorded against the real property located at 400 Ferry Point Road, Annapolis, Maryland 21403 in the original principal amount of $870,000.00.  As of the Petition Date, the Bank of New York Mellon Trust Company asserts a secured claim in the amount of $442,900.53, including pre-petition arrears in the amount of $266,654.38.  As of the Confirmation Date, the Debtor anticipates Bank of New York's Allowed Class 1 Secured Claim to be reduced (on account of post-petition payments) to approximately $334,000.00.  The Note is governed by a fixed rate of interest in the amount of 4.5%, which shall remain unchanged.  The Note matures by its terms on December 1, 2021.  By the Debtor's confirmed Plan, the Debtor shall make monthly note payments to the Bank of New York Mellon at the non-default rate of interest of 4.5%.  The Debtor's monthly payment (including escrow for property taxes and insurance) shall be $4,500.00 per month through and including December 31, 2022 (the "Final Date"), at which time the balance, if any, of the Allowed Class 1 Secured Claim shall be paid in full.  Notwithstanding anything to the contrary, under the Debtor's Confirmed Plan, the Debtor shall list the 400 Ferry Point Road Property for sale with a reputable broker no later than March 1, 2021.  On or before the Final Date, the Debtor shall pay the Class 1 Allowed Secured Claim of Bank of New York Mellon Trust Company in full.  If Bank of New York's Class 1 Allowed Secured Claim is not paid in full on or before the Final Date, the Class 1 Claimant may exercise its state court rights and remedies to foreclose on the Principal Residence, or to seek conversion of this case to Chapter 7.  Bank of New York Mellon shall retain its lien on the Ferry Point Road Property.

Class 1 is Impaired and is entitled to Accept or Reject the Plan.

19

**D.** **Payment of Allowed Secured Claim of SunTrust Bank.**
**Class 2**

This Class consists of the Allowed Secured Claim of SunTrust Bank pursuant to a Home Equity Line of Credit Agreement and Promissory Note dated February 5, 1993 in the original principal amount of $110,000.00. The Home Equity Line of Credit is secured by a Home Equity Line of Credit Deed of Trust recorded against the Principal Residence located at 400 Ferry Point Road, Annapolis, Maryland 21403. As of the Petition Date, the balance asserted by SunTrust Bank was $35,810.79, including pre-petition arrears in the amount of $706.64. As of the Confirmation Date, the Debtor anticipates SunTrust's Class 2 Allowed Secured Claim to be reduced (on account of post-petition payments) to approximately $25,750.00. By the Debtor's confirmed Plan, the Debtor shall make monthly note payments to SunTrust Bank at the non-default rate of interest of 6.5%. The Debtor's monthly payment shall be $350.00 per month (or such other contractual amount as set forth in the Promissory Note) through and including the Final Date, at which time the Debtor shall pay the Allowed Secured Claim of SunTrust Bank in full. Notwithstanding anything to the contrary, under the Debtor's Confirmed Plan, the Debtor shall list the 400 Ferry Point Road Property for sale with a reputable broker no later than March 1, 2021. On or before the Final Date, the Debtor shall pay the Class 2 Allowed Secured Claim of SunTrust Bank, in full. If SunTrust Bank's Class 2 Allowed Secured Claim is not paid in full on or before the Final Date, the Class 2 Claimant may exercise its state court rights and remedies to foreclose on the Principal Residence, or to seek conversion of this case to Chapter 7. SunTrust Bank will retain its lien against the Principal Residence.

Class 2 is Unimpaired, and is not entitled to Accept or Reject the Plan.

**E.** **Payment of Allowed Secured Claim of Estate of Daniel N. Kohn**
**Class 3**

This Class consists of the Allowed Secured Claim of the Estate of Daniel N. Kohn

20

pursuant to a February 8, 2012 Confessed Judgment Promissory Note between the Estate of Daniel N. Kohn, as payee, and Vienna Establishments, Ltd. a/k/a Tradeways, Ltd., as maker, in the original principal amount of $1,800,000.00. As of the Petition Date, the balance asserted by the Estate of Daniel N. Kohn was $979,996.23. The Confessed Judgment Promissory Note is guaranteed by the Debtor, and is secured by an Indemnity Deed of Trust recorded against, among other things, the Principal Residence located at 400 Ferry Point Road, Annapolis, Maryland 21403, and the real property owned by 184 Duke of Gloucester, LLC. By this Confirmed Plan, the Debtor, and/or Tradeways, Ltd., shall make payments to the holder of the Allowed Class 3 Secured Claim in the amount of $10,000.00 per month, without interest. Since the Petition Date, Tradeways has been funding the payments to the Estate of Daniel N. Kohn, and intends to continue to fund such payments during the term of this Plan. As of the date of this Disclosure Statement, Tradeways remains current on its payments to the Estate of Daniel N. Kohn. The terms and conditions of the Confessed Judgment Promissory Note and the Indemnity Deed of Trust shall remain unchanged, *except, however*, in the event the 400 Ferry Point Road Property is sold, the holder of the Class 3 Allowed Secured Claim shall, as an accommodation to the Debtor, release its lien against the 400 Ferry Point Road Property (only) in exchange for a cash payment at closing in the amount of $600,000.00. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the balance of the Class 3 Allowed Secured Claim (after payment of the $600,000 at closing) shall remain due and owing, and shall continue to be paid by the Debtor and/or Tradeways, Ltd. in the amount of $10,000.00 per month, secured by the real property and improvements owned by 184 Duke of Gloucester, LLC, as evidenced by that certain deed of trust recorded among the land records for Anne Arundel County at Liber 24301, Folio 416, until the Class 3 Allowed Secured Claim is paid in full. Subject to the release condition contained in this Class 3, the Estate of Daniel N. Kohn shall retain its lien on the Ferry

21

Point Road Property and any other collateral for which the Class 3 Allowed Secured Claim attaches.

Class 3 is Impaired, and is entitled to vote to accept or reject the Plan.

**F.      Payment of Allowed Secured Claim of the Internal Revenue Service Class 4**

This Class consists of the Allowed Secured Claim of the Internal Revenue Service in the amount of $160,453.45, as evidenced by Amended Proof of Claim No. 1-~~3~~ 4 filed in the Bankruptcy Case.  The Internal Revenue Service shall be paid, with interest at the applicable rate, in the amount of $2,000.00 per month.  The balance of the Allowed Secured Claim of the Internal Revenue Service shall be paid in full within five (5) years of the Petition Date. Notwithstanding anything to the contrary, under the Debtor's Confirmed Plan, the Debtor shall list the 400 Ferry Point Road Property for sale with a reputable broker no later than March 1, 2021.  Upon closing on the sale of the Ferry Point Road Property, the holder of the Class 4 Allowed Secured Claim shall be paid in full.  The Internal Revenue Service will retain its lien against the 400 Ferry Point Road Property and the Debtor's personal property until such time as the Allowed Class 4 Secured Claim is paid in full.

Class 4 is Impaired, and is entitled to vote to accept or reject the Plan.

**G.      Payment of Allowed Unsecured Claim of the Department of Labor. Class 5**

This Class consists of the Allowed Unsecured Claim of the Department of Labor, Employee Benefits Security Administration, pursuant to a Consent Judgement dated February 20, 2018, and entered as a Judgment by the United States District Court for the District of Maryland, Case No. 1:18-cv-00732-GLR, against the Debtor and Tradeways, Ltd. in the original amount of $199,414.11.   As of the Petition Date, the Department of Labor asserted an

22

outstanding balance due under the Judgment in the amount of $146,575.38.  The terms of the Judgment shall remain unchanged, including the obligation of the Debtor and/or Tradeways, Ltd. to make monthly payments in the amount of $5,000.00 per month.  Since the Petition Date, Tradeways has been funding the payments to the Department of Labor, and intends to continue to fund such payments during the term of this Plan.  As of the date of this Disclosure Statement, Tradeways' remains current on its payments to the Department of Labor.  Pursuant to an Order of the Bankruptcy Court dated September 23, 2019, this Class 5 Allowed Unsecured Claim is non-dischargeable pursuant to Section 523 of the Bankruptcy Code.

Class 5 is Unimpaired, and is not entitled to vote to accept or reject the Plan.

H.    **Payment of Allowed General Unsecured Claims: Class 6**

This Class consists of the Allowed General Unsecured Claims scheduled and/or asserted against the Debtor that are to be paid under the Plan, consisting of the Comptroller of Maryland ($129,616.00);  Internal Revenue Service ($366,044370,645.06);  Capital One Bank, N.A. ($5,454.17); Bay Engineering, Inc. ($2,049.65); Toyota Motor Credit Corporation ($515.00); Bank of America, N.A. ($938.00); Capital Digestive Care ($490.92); Chase Bank ($13,890.00); Citibank, N.A. ($1,968.00); Professional Business Management ($8,703.36); and RE Robertson Plumbing ($1,623.72).[9]  In full and final satisfaction and discharge of each Allowed Class 6 General Unsecured Claims, each Holder of an Allowed Class 6 Claim shall receive, on a pro-rata basis, in the amount of thirty-one (31%) of their Allowed Claims, in cash, beginning on the Effective Date, followed by semi-annual payments on January 1 and June 1 of each year for a period not to exceed five (5) years from the Effective Date.  Attached to this Disclosure Statement as **Exhibit D** is a Schedule of Payments to Holders of Class 6 Claims.

---

[9] As set forth in Article XIII of the Plan, the Debtor reserves the right under the Plan to object to the extent, amount or validity of the Class 6 Claims.

23

Class 6 is Impaired, and is entitled to vote to accept or reject the Plan.

**I.       Plan Payments and Effect of Plan Confirmation:**

Except as otherwise set forth in the Plan, Plan payments will begin on the Effective Date. The Effective Date is the date that is thirty days after entry of a final non-appealable Order confirming the Debtor's Plan of Reorganization, as defined more fully in the Plan.  Debtor will act as the disbursement agent for the Plan payments.

Confirmation of this Plan constitutes a binding contract between the Debtor and all of his Creditors, and is enforceable against each such Creditor, whether or not each such Creditor accepted the Debtor's Plan.

**IX.    CONTESTED CLAIMS**

Notwithstanding anything to the contrary, the Debtor and all Creditors shall be entitled to object to Claims, including any Claim which has been listed by the Debtor in the Schedules in an amount not disputed or contingent.  Any objections to such Claims (other than Fee Claims) shall be served and filed on or before the later of: (a) thirty (30) days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.

To the extent a Claim is a Disputed Claim, the Debtor shall not be required to make the applicable disputed portion of a payment to the holder of such Disputed Claim which would otherwise be payable to the holder of a Disputed Claim.  In the event that a Disputed Claim is subsequently allowed, the Debtor shall thereafter promptly pay the appropriate amount to the holder of the Claim in accordance with the terms of the Plan and in the same manner as any other creditor of the same Class, including any accrued but unpaid disbursements under the Plan.

**X.     MEANS OF EXECUTION OF THE PLAN**

**A.     General**

24

The Debtor will fund the Plan from income from operations of the Debtor's business, social security income, and from the sale of the ~~Principal Residence and the Toledo Ohio rental property~~Ferry Point Road Property and the Mayfair Blvd. Property, which properties shall be listed for sale with a reputable agent no later than March 1, 2021. The Debtor anticipates that upon a sale of the ~~Principal Residence~~Ferry Point Road Property, the holders of Allowed Claims in Classes 1, 2 and 4 will be paid in full. Class 3 will also be paid in full under the Plan, though the holder of the Class 3 Claim shall retain its lien on and against the 184 Duke of Gloucester property.

Upon the sale of the Ferry Point Road Property and the Mayfair Blvd. Property, the Debtor anticipates Allowed Priority Tax Claims will be curtailed by approximately $495,000.00, as described more fully in **Exhibit B** to this Disclosure Statement, with the balance of Allowed Priority Tax Claims to be paid from the Debtor's income.~~The anticipated surplus at closing on the sale of the Principal Residence is expected to be between $264,000 (on the low end) and $450,000.00 (on the high end). The surplus sale proceeds from the sale of the Principal Residence shall be allocated to the Allowed Priority Tax Claims on a *pro-rata* basis. Similarly, the net proceeds from the sale of the Toledo, Ohio property, estimated to be approximately $60,000.00, shall also be allocated, on a *pro-rata* basis, to Allowed Priority Tax Claims.~~

The Debtor's source of funding for the Plan is attached hereto as **Exhibit B.**

B. **Disputes Regarding Disbursements**

In the event of any dispute regarding a disbursement to be made to any creditor with an Allowed Claim or Interest, the Debtor shall not be required to distribute any funds but may place the same in an interest bearing escrow account pending resolution of the controversy by the Bankruptcy Court. Once the dispute is resolved, the Debtor shall thereafter promptly pay the appropriate amount from escrow to the holder of the Claim in accordance with the terms of the

25

Plan and in the same manner as any other creditor of the same Class.

        **C.**        **Unclaimed Disbursement**

In the event that a creditor with an Allowed Claim fails to cash all disbursement checks provided for under the Plan within one-hundred twenty (120) days from the date of such check(s), the Debtor shall provide written notice to such creditor, as well as creditor's agent authorized by law to accept service, by certified mail, return receipt requested, advising Creditor that Creditor's failure to negotiate such check(s) will result in forfeiture of Creditor's right to payment under the Plan.  In the event Creditor does not negotiate the payment(s) within thirty (30) days from the date of such notice, said creditor shall forfeit all rights to any payment under the Plan and shall have no Claim whatsoever against the Debtor or creditors with Allowed Claims.  Any disbursements so forfeited shall be returned to the Debtor and will be redistributed to creditors on a pro rata basis, or if Creditors have been paid in full, the forfeited disbursements shall be returned to the Debtor.

## XI.   **POST-CONFIRMATION PROFESSIONAL FEES**

All reasonable fees for services rendered in connection with this Chapter 11 case and the Plan after the Effective Date, including those relating to the resolution of any pending claims, shall be paid by Debtor as billed.

## XII.  **EXECUTORY CONTRACTS**

The Debtor is party to a certain unexpired lease of residential real property located at 803 Mayfair Blvd, Toledo, Ohio 43612.  The unexpired between the Debtor and the tenant of the Mayfair Blvd. property shall be assumed as of the Confirmation Date.  All other executory contracts and unexpired leases shall be rejected, unless such contracts are the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code prior to the Effective Date.

26

**XIII. PREFERENCES AND AVOIDABLE TRANSFERS**

Any action by Debtor or any other authorized party-in-interest to recover property of the estate and avoid any transfer pursuant to §§542, 543, 544, 547, 548 or 549 of the Bankruptcy Code, if not already completed, shall be commenced by the filing of a complaint pursuant to Bankruptcy Rule 7003 within thirty (30) days following the Effective Date.   As of the date of this Disclosure Statement, the Debtor is aware of one or more avoidable transfers made to Kathleen Monroe in the estimated amount of $9,500, which the Debtor will pursue.  The Debtor reserves the right to pursue any additional claims or causes of action within thirty (30) days of the Effective Date.

**XIV.   SPECIAL TAX TREATMENT PURSUANT TO 11 U.S.C. § 1146**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.  The Debtor intends to seek the benefits of Section 1146 with respect to the sale of the ~~Principal Residence~~Ferry Point Road Property and the Mayfair ~~Road~~ Blvd. Property, which are critical and necessary components of the Debtor's Plan of Reorganization.

**XV.   TAX CONSEQUENCES OF CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION**

27

Any distribution under the Plan entails certain tax consequences for the recipient.  In addition, the Debtor's discharge of his obligations upon substantial consummation of his Plan may impact creditors, though creditors are expected to be paid in full.  The Debtor makes no representations with regard to any such tax consequences.  As a result, all Creditors and parties-in-interest who may be affected by the Plan should consult their own tax advisor for a complete analysis of the tax consequences arising from their treatment upon confirmation of Debtor's Plan.

Certainly, the receipt of income by the Debtor has tax ramifications to the Debtor, which in turn, could impact Debtor's future disposable income.   In particular, the sale or other disposition of any of the Debtor's properties may result in capital gains or other tax consequences to the Debtor, although the Debtor has substantial carry-over losses that the Debtor believes will offset capital gains, if any.

**XVI.    VALUE OF THE DEBTOR'S ASSETS AND LIABILITIES**

The Debtor's assets and liabilities are more fully shown in the Schedules of assets and liabilities, as amended (the "Schedules") filed with the Bankruptcy Court by the Debtor.  At the time the Schedules were filed or amended, they contained, to the best of Debtor's knowledge, information and belief, an accurate summary of the Debtor's assets and liabilities.

**XVII.    BINDING EFFECT OF THE PLAN**

The confirmation of Debtor's Plan by the Bankruptcy Court constitutes a binding contract between the Debtor and all of his Creditors, and is enforceable against each such creditor, whether or not each such creditor accepted Debtor's Plan.

**XVIII.   FEASIBILITY:  DEBTOR'S ABILITY TO FUND THE PLAN**

As discussed below, Debtor maintains that the Plan satisfies the feasibility requirement of §1129(a)(1) of the Bankruptcy Code.

28

**Debtor's Ability to Fund the Plan**

The Debtor will fund the Plan from income from operations of the Debtor's business, social security income, and from the sale of the Principal Residence and the Toledo Ohio rental property, which properties shall be listed for sale no later than March 1, 2021.   The Debtor anticipates that upon a sale of the Principal Residence, the holders of Allowed Claims in Classes 1, 2 and 4 will be paid in full.  Class 3 will also be paid in full under the Plan, though the holder of the Class 3 Claim shall retain its lien on and against the 184 Duke of Gloucester property.

Upon the sale of the Ferry Point Road Property and the Mayfair Blvd. Property, the Debtor anticipates Allowed Priority Tax Claims will be curtailed by approximately $495,000.00, as described more fully in **Exhibit B** to this Disclosure Statement, with the balance of Allowed Priority Tax Claims to be paid from the Debtor's income. ~~The anticipated surplus at closing on the sale of the Principal Residence is expected to be between $264,000 (on the low end) and $450,000.00 (on the high end).   The surplus sale proceeds from the sale of the Principal Residence shall be allocated to the Allowed Priority Tax Claims on a *pro-rata* basis.   Similarly, the net proceeds from the sale of the Toledo, Ohio property, estimated to be approximately $60,000.00, shall also be allocated, on a *pro-rata* basis, to Allowed Priority Tax Claims.~~

~~The sale of the foregoing properties shall result in an aggregate reduction in the Priority Tax Claims of between $324,000.00 and $510,000.00.   The balance of the Priority Tax Claims shall be paid from the Debtor's income.  *See* Exhibit B.~~

## XIX.    LIQUIDATION ANALYSIS

Creditors are advised that, as an alternative to the proposed confirmation and execution of the Debtor's Plan, this case is subject to conversion to Chapter 7 of the Bankruptcy Code.  In order to ascertain adequate information to make an informed decision concerning the acceptance

or rejection of the Plan, creditors should compare the amount of return on their claims under the Plan with the amount of return should the cases be converted to a Chapter 7 proceeding.  In the event that the Debtor is forced into liquidation in a Chapter 7 case, the Debtor's principal assets will either be sold by a Chapter 7 Trustee or abandoned to the Debtor subject to the liens of secured creditors.

Under Chapter 7 of the United States Bankruptcy Code, the Office of the United States Trustee would appoint a Chapter 7 trustee whose duty it is to liquidate the assets of the Debtor's Estate as promptly as reasonably possible.  The value received from liquidations in Chapter 7 tend to be reduced by (i) the nature of the forced sale or auction of the assets and (ii) the commission collected by the Chapter 7 trustee, auctioneer and other professional fees that may be incurred~~Under Chapter 7 of the United States Bankruptcy Code, the Office of the United States Trustee would appoint a Chapter 7 trustee whose duty it is to liquidate the assets of the estate as quickly as possible.  In Chapter 7, the Chapter 7 trustee would be liquidating the assets not for fair market value but on a forced or "quick sale" basis.  The financial return from such a "quick sale" of the Debtor's property would be reduced by (i) the nature of the forced sale or auction of the assets, (ii) the expenses for the costs of sale, and (iii) the commission collected by the Chapter 7 trustee, auctioneer and other professional fees that may be incurred.~~

In determining whether to liquidate the Debtor's assets, the Trustee will first have to make a determination as to the benefit that would be received by the Debtor's unsecured creditors in the event of liquidation.  As more fully set forth below, based on current priorities, a sale of the ~~Principal Residence~~Ferry Point Road Property by the Trustee would not result in a distribution to priority or general unsecured creditors and, accordingly, it is possible~~, if not likely,~~ that the Trustee would abandon the ~~Principal Residence~~Ferry Point Road Property,

30

allowing for the Bank of New York Mellon or another secured creditor to foreclose on ~~the Principal Residence~~that property.

Under the Debtor's Plan, as an accommodation to the Debtor, the holder of the Class 3 Secured Claim has agreed to release its lien against the Ferry Point Road Property ~~Principal Residence~~ upon payment of $600,000.00 (the holder of the Class 3 Claim asserts a balance as of the Petition Date of $979,996.23), which results in the availability ~~of  approximately $264,000.00 and $450,000 in sale proceeds~~ of approximately $402,000.00 (net of capital gains taxes) for the benefit of holders of Allowed Priority Tax Claims.  Absent the accommodation by the holder of the Class 3 Allowed Secured Claim, it is anticipated that priority unsecured creditors would receive a significantly smaller distribution if this case was converted to Chapter 7, and ~~general~~ General ~~unsecured~~ Unsecured ~~creditors~~ Creditors ~~will~~ would receive no distribution.

If the Debtor's case was converted to Chapter 7~~,~~. ~~the Debtor's equity interest in Tradeways would yield no recovery to creditors of the Debtor.  Based on Tradeways' balance sheet, it is highly unlikely anyone would purchase the Debtor's economic interest in Tradways. Similarly,~~ a Chapter 7 Trustee ~~has no ability to sell the real property located at 184 Duke of Gloucester; a Chapter 7 Trustee~~ would have the ability to ~~would only be permitted to~~ sell the Debtor's 70% economic ~~(non-voting)~~ interest in ~~the~~ 184 Duke of Gloucester, LLC.  Though the Chapter 7 Trustee has the ability to liquidate a Debtor's membership interest in a limited liability company, there are complexities in multi-member limited liability companies that *could* limit the value a Chapter 7 Trustee receives, including, the likelihood that a successor to the Debtor's interest would have no voting or management rights, which may limit the universe of potential purchasers or the value such purchaser is willing to pay.  Notwithstanding, in~~, which may result in a de minimis recovery to priority unsecured creditors, but likely no recovery to general~~

31

unsecured creditors the event the Chapter 7 Trustee sold the Debtor's interest in the LLC at maximum value or, alternatively, caused Duke of Gloucester, LLC to liquidate the real property it owned, after costs of sale, taxes and payment of the lien of the Estate of Daniel Kohn, the Chapter 7 Trustee might realize approximately $235,000.00.  Notwithstanding, as stated earlier, but for the accommodation offered to the Debtor by the Holder of the Class 3 Claim, if the Debtor's Chapter 11 case is converted to Chapter 7, the Holder of the Class 3 Claim no longer has an obligation to release its lien for $600,000.00, and therefore the Chapter 7 Trustee would either abandon the sale of the Ferry Point Road Property, or sell the property and pay the remaining sale proceeds to Holders of Priority Tax Claims, leaving no funds available to Holders of Allowed General Unsecured Claims..

The Debtor's only other principal asset is the Mayfair Blvd. property Property(Ohio), with an estimated value, net of taxes, fees and closing costs, in the amount of approximately $6065,000100.  The Debtor's remaining personal property, consisting of a vehicle, furniture, cash and investments, total, net of exemptions, approximately $20,000.00.

As set forth in the Liquidation Analysis attached hereto as **Exhibit DE**, the Debtor believes that his treatment of Creditors under a confirmed Chapter 11 Plan is more beneficial to Creditors and the estate than an immediate or prompt liquidation of Debtor's assets in Chapter 7. The Debtor believes that the Plan maximizes recoveries and urges all claims to vote for the Plan.

## XX.    DEFAULT

An event of default under the Plan shall occur if the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan, for more than ten (10) days after the time specified in the Plan for such payment or other performance ("Event of Default").  Upon the occurrence of an Event of Default, the Creditor shall serve by first class mail to Debtor and Debtor's attorney a written notice of default and a ten (10) day

32

opportunity to cure or to move to obtain from the Bankruptcy Court an extension of time to cure the default, or a determination that no default occurred.  In the event the Debtor fails to cure the default or seek and obtain an extension to cure from the Bankruptcy Court, any Creditor or party-in-interest shall have the immediate right to exercise their state court rights and remedies against the Debtor, or seek conversion of the Debtor's case to Chapter 7.  Absent agreement of all Creditors, the Debtor shall not be entitled to an extension of the Final Date and a notice of an Event of Default under such circumstance shall not be necessary or required.

**XXI.    NEW VALUE CONTRIBUTION**

Pursuant to the United States Court of Appeals for the Fourth Circuit's ruling in *In re Maharaj*, 681 F.3d 558 (4th Cir. 2012), the Absolute Priority Rule ("APR") provisions of 11 U.S.C. § 1129(b)(2)(B)(ii) may be applicable to the within case.  This section states that "[t]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property except that in a case in which the debtor in an individual the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section."  Subsection (a)(14) concerns domestic support obligations and is inapplicable to this Chapter 11 Case.  The APR applies only where Class 6 - the Class of General Unsecured Claims - votes against the proposed treatment under the Plan.  It is believed that Class 6 will vote in favor of the Plan; if Class 6 does not vote in favor of the Plan, the APR would apply.

If the APR applies, the Debtor shall pay, on the Effective Date, ~~In consideration of the Debtor's retention of exempt and non-exempt assets, the Debtor shall tender~~ a new value contribution in the amount of ~~the sum of Twenty~~ Twenty Thousand Dollars ($20,000.00), which shall be paid from non-estate assets ~~on the Effective Date to be used to pay Allowed Administrative Claims~~.  This sum is believed to be sufficient to address the requirements of the

33

"new value rule."  The new value is paid into the Plan by the Debtor to essentially "repurchase" this old equity, so that the Debtor may maintain ownership of his assets "on account of a substantial, necessary, and fair new value contribution."  *In re RTJJ, Inc.*, 2013 Bankr. LEXIS 481 (Bankr. W.D.N.C. Feb. 6, 2013) (quoting *In re Bonner Mall P'ship*, 2 F.3d 899, 909 (9th Cir. 1993).   The value of the non-exempt assets retained is approximately $13,000.00.

Additionally, pursuant to section 1121 of the United States Bankruptcy Code, the exclusivity period for the Debtor to file a plan of reorganization expired on June 4, 2019. Notwithstanding, any Creditor who wishes to file a competing plan is currently free to do so.

Insofar as no other Creditor has submitted a bid greater than $20,000.00 or filed a competing plan, it is believed the proposed new value contribution is reasonably equivalent to the value received.

**XXII.  <u>CONCLUSION</u>**

Debtor Joseph Gorski proposes his Plan in an effort to treat each Creditor fairly. The Plan represents the Debtor's best attempt to maximize the value of his assets.  The Plan accomplishes this result and ensures that all Creditors will be treated equitably. The Debtor therefore recommends acceptance of the Plan.

34

**/s/ Joseph Gorski**
**Joseph Gorski**

Respectfully submitted,

MCNAMEE, HOSEA, JERNIGAN, KIM
GREENAN & LYNCH, P.A.

 **/s/ Steven L. Goldberg**
Steven L. Goldberg (Fed Bar No. 28089)
6411 Ivy Lane, Suite 200
Greenbelt, Maryland  20770
(301) 441-2420
Attorneys for Joseph Gorski

**List of Exhibits to Disclosure Statement**

| | |
|---|---|
| Exhibit A | Debtor's Plan of Reorganization |
| Exhibit B | Debtor's Financial Projections |
| Exhibit C | Tradeways' Active / Pending Transactions |
| Exhibit D | Debtor's Schedule of Payments to Class 6 Holders of General Unsecured Claims |
| Exhibit E | Liquidation Analysis |

35

36